## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**RECKITT BENCKISER, INC.**             )
                                        )
   **Plaintiff,**        )
                                        )
    **v.**          )  **Civil Action No. 09-445 (ESH)**
                                        )
**LISA P. JACKSON,**                    )
**ADMINISTRATOR, UNITED STATES**        )
**ENVIRONMENTAL PROTECTION**            )
**AGENCY, ET AL.,**                     )
                                        )
   **Defendants.**        )
_____)

## MEMORANDUM OPINION

Following a remand from the Court of Appeals, *see Reckitt Benckiser, Inc. v. EPA*, 613

F.3d 1131, 1133 (D.C. Cir. 2010), the parties have filed cross-motions for summary judgment on

the following issue of statutory interpretation: whether the United States Environmental

Protection Agency ("EPA") has authority under the Federal Insecticide, Fungicide and

Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y, to bring a misbranding action in lieu of a

cancellation proceeding against plaintiff Reckitt Benckiser's registered rodenticide products

based solely on those products' non-compliance with the EPA's May 28, 2008 "Risk Mitigation

Decision for Ten Rodenticide Products" ("RMD"). For the reasons stated herein, the Court will

grant plaintiff's motion, deny defendant's motion, and enjoin EPA from bringing an enforcement

action against plaintiff or any of its products based upon a failure to satisfy the requirements of

the RMD until defendants have completed the administrative cancellation procedures required

by FIFRA Section 6, 7 U.S.C. § 136d.

**BACKGROUND**

## I.        STATUTORY FRAMEWORK

The following sections of FIFRA, 7 U.S.C. §§ 136-136y, are relevant to the question of statutory interpretation that is before the Court: § 136 (Definitions) (FIFRA § 2); § 136a (Registration of Pesticides) (FIFRA § 3); § 136a-1 (Reregistration of registered pesticides) (FIFRA § 4); § 136d (Administrative review; suspension) (FIFRA § 6); § 136j (Unlawful acts) (FIFRA § 12); 7 U.S.C. § 136k (Stop sale, use, removal, and seizure) (FIFRA § 13); and § 136l (Penalties) (FIFRA § 14).

### A.        Registration (7 U.S.C. § 136a)

FIFRA requires that all pesticide products sold or distributed in the United States be registered with EPA. 7 U.S.C. § 136a(a). EPA is directed to approve the registration of a pesticide if "(A) its composition is such as to warrant the proposed claims for it; (B) its labeling and other material required to be submitted comply with the requirements of this subchapter; (C) it will perform its intended function without unreasonable adverse effects on the environment; and (D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment."[1] 7 U.S.C. § 136a(c)(5) (hereinafter "Registration Standard"). "A FIFRA registration is a product-specific license describing the terms and conditions under which the product can be legally distributed, sold, and used." *See Reckitt*, 613 F.3d at 1133 (citing 7 U.S.C. § 136a(a), (c)-(e)).

---

[1]"Unreasonable adverse effects" in relevant part means "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

**B.      Cancellation of a Registered Pesticide (7 U.S.C. § 136d)**

"A pesticide product remains registered until EPA or the registrant cancels it pursuant to

FIFRA Section 6, 7 U.S.C. § 136d."[2] *Reckitt*, 613 F.3d at 1134.  EPA may commence

cancellation proceedings "[i]f it appears to the [EPA] Administrator that a pesticide or its

labeling or other material required to be submitted does not comply with the provisions of this

subchapter or, when used in accordance with widespread and commonly recognized practice,

generally causes unreasonable adverse effects on the environment."  7 U.S.C. § 136d(b)[3]

(hereinafter "Cancellation Standard").  The statute gives EPA the option of either issuing a

notice of intent to cancel or issuing a notice of intent to hold a hearing to determine whether or

not a registration should be canceled.  *Id.*  If the first option is chosen, the registrant may demand

a hearing.  *Id.* § 136d(b), (d); 40 C.F.R. § 164.20.  Once a final decision to cancel has been made,

the registrant may seek judicial review of that decision by filing a petition for review in a court

of appeals.  7 U.S.C. § 136n.

**C.      Misbranding / Unlawful Acts / Enforcement / Penalties
         (7 U.S.C. §§ 136, 136j, 136k, 136l)**

Under FIFRA, EPA has the authority to bring enforcement actions for "unlawful acts,"

one of which is distributing or selling  a pesticide which is "misbranded."  7 U.S.C. § 136j, 136k,

---

[2]"The term 'registrant' means a person who has registered any pesticide pursuant to the provisions of this subchapter."  7 U.S.C. § 136(y).

[3]Before issuing any notice, EPA has to provide the Department of Agriculture with notice and the opportunity to provide input on the determination, consult with the Secretary of Health and Human Services, "when a public health use is affected," and present its case to an independent Science Advisory Panel.  7 U.S.C. §§ 136d(b) & (d); *id.* § 136w(d).

136l.[4]  A pesticide is "misbranded" under FIFRA if[5]

> (A) its *labeling* bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular;

> (B) it is contained in a package or other container or wrapping which does not conform to . . . section 136w(c)(3) of this title [Child-Resistant Packaging requirements];

>          . . .

> (F) the *labeling* accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment;

> (G) the *label* does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment.

7 U.S.C. § 136(q)(1) (emphasis added).  The terms "protect health and the environment" and

"protection of health and the environment" are further defined in section 136(x) to mean

"protection against any unreasonable adverse effects on the environment," 7 U.S.C. § 136(x), the

same language used in the Registration and Cancellation Standards.  7 U.S.C. §§ 136a, 136d.

When EPA concludes that a pesticide is "misbranded" in violation of FIFRA, it "may

issue a written or printed 'stop sale, use, or removal' order to any person who owns, controls, or

---

[4]Other "unlawful acts" include, but are not limited to, distributing or selling "(A) any pesticide that is not registered under section 136a of this title or whose registration has been canceled or suspended . . . ; (B) any registered pesticide if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as a part of the statement required in connection with its registration under section 136a of this title; [or] (C) any registered pesticide the composition of which differs at the time of its distribution or sale from its composition as described in the statement required in connection with its registration under section 136a of this title."  7 U.S.C. § 136j(a)(1).

[5]According to EPA, these are the four types of misbranding that are "most pertinent to the issue in the pending matter."  (Defs.' Mem. at 6.)

has custody of such pesticide," 7 U.S.C. § 136k(a)[6]; it may commence an *in rem* seizure action against the pesticide product "in any district court in the district where it is found" 7 U.S.C. § 136k(b)(1)(a); it may seek civil penalties against "[a]ny registrant, commercial applicator, wholesaler, dealer, retailer, or other distributor who violates any provision of this subchapter," 7 U.S.C. 136l(a); and it may seek criminal penalties against "[a]ny registrant, applicant for a registration, or producer who knowingly violates any provision of this subchapter. 7 U.S.C. § 136l(b).

## D.    Reregistration of Registered Pesticides (7 U.S.C. § 136a-1)

In 1988, Congress enacted FIFRA Section 4, which established procedures for the reregistration of pesticides whose active ingredients were first registered in a pesticide before November 1, 1984.  *See* 7 U.S.C. § 136a-1(a).  The process involved five phases, 7 U.S.C. § 136a-1(b),[7] culminating in a determination by EPA "whether to reregister a pesticide by

---

[6]In its entirety, § 136k(a) provides:

Whenever any pesticide or device is found by the Administrator in any State and there is reason to believe on the basis of inspection or tests that such pesticide or device is in violation of any of the provisions of this subchapter, or that such pesticide or device has been or is intended to be distributed or sold in violation of any such provisions, or when the registration of the pesticide has been canceled by a final order or has been suspended, the Administrator may issue a written or printed "stop sale, use, or removal" order to any person who owns, controls, or has custody of such pesticide or device, and after receipt of such order no person shall sell, use, or remove the pesticide or device described in the order except in accordance with the provisions of the order.

7 U.S.C. § 136k(a).

[7]Subsection (b) summarizes the five reregistration phases:

(1) The first phase shall include the listing under subsection (c) of this section of the active ingredients of the pesticides that will be reregistered.

determining whether such pesticide meets the requirements of [the Registration Standard]." 7

U.S.C. § 136a-1(g)(2)(C).  If EPA determines that a pesticide "should not be reregistered,"

FIFRA provides that it "shall take appropriate regulatory action" and that such action "shall be

completed as expeditiously as possible."  *Id.* § 136a-1(g)(2)(D).

## II.    FACTS

Plaintiff manufactures pesticides that are subject to regulation under FIFRA.  On May 28,

2008, as part of FIFRA Section 4's "reregistration" process, 7 U.S.C. § 136a-1, EPA issued a

"Risk Mitigation Decision for Ten Rodenticides" ("RMD").  (Pl.'s Mem. in Support of Mot. for

Summ. J. ["Pl.'s Mem."], Ex. 1, Sept. 24, 2010; Pl's Statement of Material Facts ["Pl.'s SOMF"]

¶ 1.)[8]  The RMD set forth EPA's "final decision on the reregistration eligibility of rodenticide

---

(2) The second phase shall include the submission to the Administrator under subsection (d) of this section of notices by registrants respecting their intention to seek reregistration, identification by registrants of missing and inadequate data for such pesticides, and commitments by registrants to replace such missing or inadequate data within the applicable time period.

(3) The third phase shall include submission to the Administrator by registrants of the information required under subsection (e) of this section.

(4) The fourth phase shall include an independent, initial review by the Administrator under subsection (f) of this section of submissions under phases two and three, identification of outstanding data requirements, and the issuance, as necessary, of requests for additional data.

(5) The fifth phase shall include the review by the Administrator under subsection (g) of this section of data submitted for reregistration and appropriate regulatory action by the Administrator.

7 U.S.C. § 136a-1(b).

[8]In a June 24, 2008 letter from EPA to "registrants," EPA revised the RMD.  (Pl.'s Mem., Ex. 1, at 3-4.)  The revised RMD and the June 24, 2008 letter together comprise Exhibit 1 to

products containing brodifacoum; bromadiolone; bromethalin; chlorphacinine; cholecalciferol; difethialone; diphacinone (and its sodium salt); warfarin (and its sodium salt); and zinc phosphide." (RMD at 1; Pl.'s SOMF ¶ 2; Defendant's Statement of Material Facts ["Defs.' SOMF"] ¶ 2.) EPA concluded was that "these products, unless labeled and used as specified in this document, would present unreasonable risks inconsistent with FIFRA" and, thus, were not eligible for reregistration unless the registrant implemented certain "risk mitigation measures." (RMD at 25.)

The RMD directed "[p]ersons [including plaintiff] holding a manufacturing-use or end-use registration for a rodenticide product containing one of the active ingredients covered by this risk mitigation decision" to "provide a letter to the Agency on or before September 2, 2008, declaring an intent to comply or not comply with the risk mitigation measures described in this document." (*Id.*) Specifically, registrants were directed that "this 90-day response letter must indicate, for each of the registrants' registered rodenticide products, whether the registrant intends to amend the registration to conform to the risk mitigation decision." (*Id.*.) The RMD further provided that "[f]or each registered product for which a registrant declares its intent not to comply (i.e., not to amend labeling and/or packaging and not to develop a replacement bait station product), the company needs to include a request to cancel that product." (*Id.*)

The RMD stated that "should a registrant fail to implement any of the risk mitigation measures identified in this document, the Agency may take regulatory action to address the risk concerns from the use of the affected products." (*Id.*) It also provided that "June 4, 2011 would

plaintiff's motion. For ease of reference, any citation to the revised RMD uses the page numbers that appear in the document itself.

be the last day for registrants to 'release for shipment' (sell or distribute) rodenticide products not complying with the Risk Mitigation Decision" and that ""[r]odenticide products that do not comply with this Risk Mitigation Decision that a registrant releases for shipment after June 4, 2011, would be considered misbranded." (*Id.* at 26.) However, according to the EPA, the RMD "does not represent individual product reregistration decisions under FIFRA Section 4(g)(2)(C) or (D)" and that it "imposes no legally binding requirements on any regulatee, either upon issuance of the RMD or as of June 4, 2011." (Defs.' SOMF ¶¶ 2, 21.)

On June 18, 2008, EPA sent letters directly to registrants, advising them of the RMD's conclusions and implementation timetable. (Pl.'s Mem., Ex. 2, at 1.) Registrants were advised that to comply with the RMD, "[s]ome currently registered rodenticide products may be brought into compliance with the risk mitigation decision through amendment," but others "will require cancellation." (*Id.* at 3.) Thus, registrants were told, "[f]or each registered product that is covered by the risk mitigation decision and which will not be amended to comply, registrants must submit a request to voluntarily cancel that product under FIFRA § 6(f)(1) [7 U.S.C. § 136d]." (*Id.* at 4.) The 90-day response form that EPA sent out with the June 18, 2008 letter, gave registrants the option of either (1) selecting an the "intended method for complying," one of which was voluntary cancellation; or (2) selecting the option "I do not intend to voluntarily bring this product into compliance with the requirements of the May 2008 risk mitigation decision. I understand that EPA may pursue additional regulatory action, including cancellation." (*Id.* at 6.)

Plaintiff timely filed its 90-day response for its thirteen affected products,[9] indicating for

---

[9]Plaintiff's affected products have the following EPA Product Registration Numbers: 3282-3, 3282-4, 3282-9, 3282-15, 3282-32, 3282-65, 3282-66, 3282-74, 3282-81, 3282-85, 3282-86, 3282-87, 3282-88. (Pl.'s Mem., Ex. 4, at 2-4.)

each its "intent not to comply with the Risk Mitigation Decision" because it would "remove the most effective and affordable rodent control products from consumers' hands, without any significant countervailing benefit." (Pl.'s Mem., Ex. 4, at 1 [Aug. 28, 2008 Letter from Plaintiff to EPA].) In subsequent oral and written communications, plaintiff requested that EPA commence the administrative process by issuing a Notice of Intent to Cancel the registrations for plaintiff's affected rodenticide products under FIFRA Section 6, 7 U.S.C. § 136d. (Pl.'s SOMF ¶¶ 14-17; Defs.' SOMF ¶¶ 14-17; Pl.'s Mem., Ex. 5, at 1 [Nov. 11, 2008 Letter from Plaintiff's Counsel to EPA]; Pl.'s Mem., Ex. 6, at 1 [Jan. 9, 2009 Letter from Plaintiff's Counsel to EPA].) On February 3, February 26, and March 5, 2009, the Agency verbally confirmed that EPA had no plans to initiate cancellation proceedings. (Pl.'s SOMF ¶ 17; Defs.' SOMF ¶ 17.)

## III. PROCEDURAL HISTORY

On March 5, 2009, plaintiff filed its Verified Complaint in this matter, seeking declaratory and injunctive relief preventing EPA from initiating misbranding or other enforcement actions against plaintiff's affected products until the procedures of FIFRA § 6 had been initiated and completed. (Pl.'s SOMF ¶ 18; Defs.' SOMF ¶ 18.) Plaintiff asked the Court to "declare EPA's failure to initiate cancellation proceedings in the face of EPA's threat of enforcement action [to be] arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law," and to issue "an injunction prohibiting EPA from taking enforcement action against the [plaintiff's] products until such time as EPA has initiated and fully completed the administrative processes provided for under FIFRA § 6 . . ., and ordering EPA to initiate the Section 6 Procedures in which [plaintiff] can challenge the merits of the RMD." (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 2, June 22, 2009). EPA moved to dismiss on a number of grounds,

including lack of subject matter jurisdiction. On October 30, 2009, this Court granted the motion to dismiss, concluding that jurisdiction lay with the Court of Appeals because plaintiff was asking the Court to enforce the reregistration requirement that EPA take "appropriate regulatory action" as "expeditiously as possible." *Reckitt*, 666 F. Supp. 2d 131, 138 (D.D.C. 2009) (citing 7 U.S.C. 136a-1(m) ("Any failure of the Administrator to take any action required by this section shall be subject to judicial review . . . in a court of appeals.")), *rev'd*, *Reckitt*, 613 F.3d 1131. On December 4, 2009, plaintiff submitted additional correspondence to EPA reiterating its intention not to voluntarily modify its rodenticide product registrations to comply with the RMD and again requesting that EPA initiate the administrative procedures called for by the RMD and FIFRA § 6. (Pl.'s SOMF ¶ 19; Defs.' SOMF ¶ 19; Pl's Mem., Ex. 7.)

Plaintiff appealed this Court's decision and also filed a direct petition for review in the Court of Appeals. The Court of Appeals held that the first question that had to be addressed was "EPA's interpretation of its misbranding authority under FIFRA" – that is, whether EPA had authority under FIFRA to bring a misbranding action based on noncompliance with the RMD rather than commencing cancellation proceedings. *See Reckitt*, 613 F.3d at 1141 ("evaluating EPA's interpretation of its authority under FIFRA to implement the RMD through enforcement proceedings for misbranding is a prerequisite to evaluating [plaintiff's] contentions that EPA improperly delayed or refused to initiate Section 6 cancellation proceedings"). The Court of Appeals concluded that EPA's assertion of that authority in the RMD was a "binding procedural determination" that constituted "'final agency action' under the APA [Administrative Procedure Act], 5 U.S.C. § 704"; the issue was "ripe for review"; and the district court had jurisdiction because EPA's legal interpretation of its authority was "other final action of the Administrator"

under FIFRA Section 16(a), 7 U.S.C. § 136n. *Reckitt*, 613 F.3d at 1141.[10]  Thus, the Court of

Appeals remanded for this Court to decide whether EPA has the "authority under FIFRA to bring

enforcement proceedings for misbranding before, or rather than, regulatory cancellation

proceedings under [FIFRA] Section 6 against products not voluntarily complying with a

reregistration RMD."  *Id.*  As explained herein, the Court's answer to his question is that the

statute does not permit the agency to proceed by use of a misbranding proceeding to effectuate a

cancellation.

## DISCUSSION

Plaintiff argues that EPA's legal interpretation of its authority is arbitrary, capricious, an

abuse of discretion and not in accordance with law because it "would utterly defeat Congress'

intent in enacting the registration and cancellation process."  (Pl.'s Mem. in Support of Mot. for

Summ. J. at 10, Sept. 24, 2010 ["Pl's Mem."].)  Plaintiff's view is that "EPA may not bring an

enforcement action against [plaintiff's] properly registered products for allegedly failing to

conform to the [Registration Standard]," but rather "must actually comply with the Act's

provisions for cancelling a registration."  (*Id.* at 10.)  EPA argues that its interpretation is entitled

---

[10]As explained by the Court of Appeals:

EPA's interpretation of its FIFRA misbranding enforcement authority to
implement the RMD cannot properly be viewed as a form of "appropriate
regulatory action" under Section 4(g)(2)(D)(i), 7 U.S.C. § 136a-1(g)(2)(D)(i). An
agency's exercise of its regulatory authority is related to but distinct from an
agency's interpretation of a statute it administers. *Compare* 5 U.S.C. § 706 *with
Chevron,* 467 U.S. at 842-45, 104 S.Ct. 2778; *see Eagle Broad. Group, Ltd. v.
FCC,* 563 F.3d 543, 551 (D.C.Cir.2009).  Reckitt Benckiser has no remedy under
Section 4 to challenge EPA's statutory interpretation. This court, therefore, lacks
jurisdiction pursuant to Section 4(m), 7 U.S.C. § 136a-1(m), *supra* note 2.

*Reckitt*, 613 F.2d at 1141.

to deference under *Chevron* and, therefore, must be accepted because it is "reasonable." (Defs.' Mem. in Support of Defs.' Cross-Mot. for Summ. J. at 13, Oct. 12, 2010 ["Defs.' Mem."].) Even if no deference is due, EPA argues that its interpretation is "compelled" by the "plain language of FIFRA and its history." (*Id.*)

## I.    STANDARD OF REVIEW

The scope of review of a challenge to the EPA's actions under FIFRA is governed by the Administrative Procedure Act ("APA"). *See Defenders of Wildlife v. E.P.A.*, 882 F.2d 1294, 1303 (8th Cir. 1989). Agency action reviewed under the APA may not be overturned unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Court is reviewing an agency's interpretation of a law it administers, it must apply the principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 916 (D.C. Cir. 2009); *National Ass'n of Clean Air Agencies v. E.P.A.*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).

Under *Chevron*, the first step is "examine the statute *de novo*, employing 'traditional tools of statutory construction.'" *Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1228 (quoting *Chevron*, 467 U.S. at 843)); *see Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007) (court begins by "applying customary rules of statutory interpretation"). Because the judiciary functions as the final authority on issues of statutory construction, '[a]n agency is given no deference at all on the question whether a statute is ambiguous.'" *Wells Fargo Bank N.A. v. FDIC*, 310 F.3d 202, 206 (D.C. Cir. 2002) (quoting *Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132, 1136 (D.C. Cir. 1991)). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-4; *see Eagle*

*Broadcasting Group, Ltd. v. FCC*, 563 F.3d 543, 552 (D.C. Cir. 2009) (if the "search for the

plain meaning of the statute . . . yields a clear result, then Congress has expressed its intention as

to the question, and deference is not appropriate." (internal quotations omitted)); *Arkansas Dairy*

*Co-op Ass'n, Inc. v. U.S. Dept. of Agr.*, 573 F.3d 815, 829 (D.C. Cir. 2009) (no deference due

where agency's construction is "contrary to clear congressional intent"). Only if "the statute is

silent or ambiguous with respect to the specific issue," *Chevron*, 467 U. at 843, does the analysis

proceed to the next step, which is to "determine the deference, if any, [the court] owe[s] the

agency's interpretation of the statute." *Mount Royal Joint Venture*, 477 F.3d at 754. As the

Court ultimately concludes that the statute is not ambiguous with respect to the issue at hand, it

is immaterial what level of deference EPA's interpretation would be entitled to under the second

step of *Chevron*.[11] *See, e.g.*, *Martini v. Federal Nat. Mortg. Ass'n*, 178 F.3d 1336 (D.C. Cir.

1999).

## II.    STATUTORY CONSTRUCTION

Under the first step of *Chevron*, the Court must use the "customary statutory

interpretation tools of 'text, structure, purpose, and legislative history'" to determine whether

---

[11]Under the second step of *Chevron*, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44. "Where a legislative delegation to an agency on a particular question is implicit rather than explicit, [the court] must uphold any reasonable interpretation made by the administrator' of that agency." *National Ass'n of Clean Air Agencies*, 489 F.3d at 1228 (internal quotations and citations omitted); *Chevron*, 467 U.S. at 844. "On the other hand, if the agency enunciates its interpretation through informal action that lacks the force of law, we accept the agency's interpretation only if it is persuasive." *Mount Royal Joint Venture*, 477 F.3d at 754 (D.C. Cir. 2007) (citing *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)).

Congress's intent as to the precise question at issue is clear. *California Metro Mobile Communications, Inc. v. FCC*, 365 F.3d 38, 44-45 (D.C. Cir. 2004) (quoting *Consumer Electronics Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003)). Even if there are "textual ambiguities," "a statute may foreclose an agency's preferred interpretation . . . if its structure, legislative history, or purpose makes clear what its text leaves opaque." *Catawba Cty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009); *see also Ass'n of Civilian Technicians, Inc. v. U.S.*, 603 F.3d 989, 992 (D.C. Cir. 2010) (in looking at the text of a statute, "words are to be read in the context in which they are used and in the broader context of the statutory scheme" (internal quotations omitted)). Using these tools, the Court concludes that FIFRA does not give EPA the authority to pursue a misbranding enforcement action in lieu of a cancellation proceeding based on a registrant's failure to comply with the RMD.

## A. Text and Structure

Plaintiff argues that EPA's interpretation of FIFRA renders the Section 6 cancellation procedures meaningless, in violation of the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). EPA counters that plaintiff's interpretation of FIFRA suffers from similar infirmities.

### 1. 7 U.S.C. § 136d (FIFRA Section 6)

Plaintiff argues that only its interpretation is consistent with the existence and content of Section 6, 7 U.S.C. § 136d. The Court agrees. Section 6 is the "cancellation" section within FIFRA. It establishes a detailed, multi-step process that EPA *must* follow when it wants to cancel or suspend a registration. *Reckitt*, 613 F.3d at 1134 ("A pesticide product remains

registered until EPA or the registrant cancels it pursuant to Section 6.").[12]  The process imposes

certain obligations on EPA before it may issue a notice of intent to cancel or a notice of intent to

hold a hearing on cancellation, and it entitles the registrant to notice, a hearing and other

procedural protections before EPA can make a final decision on cancellation.  7 U.S.C. § 136d;

40 C.F.R. §§ 164.20-164.111.

It is undisputed that plaintiff holds valid registrations for products that EPA believes

must be cancelled because they do not comply with the RMD.  Yet, if EPA also has the authority

to bring misbranding enforcement actions after June 4, 2011, against these registered products

based on non-compliance with the RMD, it will be able to "bypass[] cancellation proceedings"

and "effect[ively] cancel[] the registrations without following the regulatory procedures provided

in Section 6."  *See Reckitt*, 613 F.3d at 1136.  To interpret FIFRA to give EPA that authority not

only renders Section 6 superfluous; it also allows EPA to avoid the rigorous cancellation process

Congress provided for in the statute.  In addition, as plaintiff points out, under EPA's

interpretation applicants whose registrations are denied are guaranteed access to the procedural

protections of Section 6, *see* 7 U.S.C. § 136a(c)(6),[13] while a product that has already been

---

[12]EPA concedes that it can only cancel a registration by commencing the cancellation process established in FIFRA Section 6.  (Defs.' Reply in Support of Defs.' Cross-Mot. for Summ. J. at 1, Nov. 8, 2010 ["Defs.' Reply"].)

[13]§ 136a(c)(6) provides:

Whenever the Administrator refuses to register a pesticide, the Administrator shall notify the applicant of the Administrator's decision and of the Administrator's reasons (including the factual basis) therefor. The Administrator shall promptly publish in the Federal Register notice of such denial of registration and the reasons therefor. Upon such notification, *the applicant for registration or other interested person with the concurrence of the applicant shall have the same remedies as provided for in section 136d of this title*.

registered and is in compliance with the terms of its registration would be deprived of those protections. Such an interpretation is simply illogical.

EPA's only response to plaintiff's Section 6 argument is that because there is no "express provision" in FIFRA linking EPA's authority to pursue misbranding action under FIFRA Sections 12, 13, and 14 to its cancellation authority in FIFRA Section 6, it follows that "it may bring a misbranding action under FIFRA Sections 12, 13, and 14, at the end of the reregistration process or at any other time, when it believes a product is misbranded, without first cancelling that product's registration under FIFRA Section 6." (Defs.' Mem. at 22) In EPA's view "[i]f Congress had intended to require EPA to cancel a registered pesticide before pursuing misbranding action, it could easily have put language to that effect into FIFRA." (*Id.*) However, given Congress's establishment of a detailed process for cancellation (or suspension in the event of an "imminent hazard"), it is reasonable (and more likely) that Congress did not expressly prohibit EPA from proceeding with a misbranding action, instead of a cancellation proceeding, because it never contemplated that EPA would try to use such an enforcement action (or threat of such an action) as a substitute for a cancellation proceeding once it had concluded that a product's registration should be cancelled.

Accordingly, the Court concludes that the existence and content of Section 6 is strong evidence that Congress intended EPA to use Section 6, not the threat of a misbranding enforcement action, to remove a product from the market if it determines that the product is no longer eligible for registration.

---

7 U.S.C. § 136a(c)(6) (emphasis added).

## 2.     7 U.S.C. § 136a-1(g)(2)(D) (FIFRA Section 4(g)(2)(D))

EPA argues that only its interpretation gives effect to FIFRA Section 4(g)(2)(D), the provision which directs EPA to take "appropriate regulatory action" once it determines that a pesticide is not eligible for reregistration. *Id*. § 136a-l(g)(2)(D).   However, this argument is not persuasive.  The only issue in the present case is whether EPA has the option of pursuing a misbranding enforcement action rather than a cancellation proceeding once it has determined as part of a reregistration eligibility decision that a product is "not eligible for reregistration," and, therefore, it must be cancelled.  To adopt plaintiff's view would not read Section 4(g) out of the statute, but would simply reject EPA's contention that "appropriate regulatory action" *under the specific factual circumstances presented here* includes a misbranding enforcement action in favor of plaintiff's position that the "appropriate regulatory action" is limited to a cancellation proceeding.[14]   FIFRA Section 4(g) does not give EPA authority to take *any* regulatory action; it gives it authority – indeed it requires it – to take "appropriate" regulatory action.  Thus, rejecting EPA's interpretation does not render this provision superfluous, it merely provides a legal interpretation as to what is an "appropriate regulatory action" under the circumstances presented here.

EPA also argues that because it is possible that misbranding might be "discovered" during the reregistration review process, "appropriate regulatory action" must include the power

_____

[14]Whether EPA could succeed in a misbranding action is not before the Court.  Indeed, the record is limited to EPA's assertion that plaintiff's products "would be misbranded" and its identification of four aspects of the definition of misbranding as the "most pertinent."  *See supra* n.5; *see also Reckitt*, 613 F.3d at 1138 ("the lack of such factual development regarding which specific FIFRA misbranding provisions EPA might apply to [plaintiff's] products does not make EPA's interpretation unripe for review").

to bring a misbranding action.  EPA's argument is circular: if a "misbranding" enforcement action is authorized by the statute, EPA may bring it, irrespective of Section 4(g) or when and how it determined that a registered product is misbranded.  But if a misbranding enforcement action is not authorized under certain circumstances – the issue before the Court – then it is not "appropriate" action.

Finally, EPA argues that because FIFRA does not expressly define what constitutes "regulatory action," nor does it specify any limits on what regulatory actions are appropriate in the context of Section 4(g)(2)(D), its interpretation must be correct.  In making this argument, however, EPA completely ignores that the legislative history posits that "appropriate regulatory action" following a reregistration eligibility decision would include actions "such as canceling, suspending, or restricting the pesticide, or imposing label changes . . . ," H.R. Rep. No. 100-939, at 30 (1988), reprinted in 1988 U.S.C.C.A.N. 3474, 3479 (1988) (emphases added), but makes no mention of a misbranding enforcement action as an option.

### 3.      7 U.S.C.  § 136(q)(1)(F) & (G)

EPA next text-based argument is that only its interpretation gives effect to 7 U.S.C. § 136(q)(1)(F) and (G).  Subsection (F) provides that a pesticide is misbranded if "the *label* accompanying it does not contain directions for use which . . . are adequate to protect health and the environment."  7 U.S.C. § 136(q)(1)(F) (emphasis added).  Subsection (G) provides that a pesticide is misbranded if "the *label* does not contain a warning or caution statement which . . . is adequate to protect health and the environment . . . ."  7 U.S.C. § 136(q)(1)(G) (emphasis added).  As other provisions already allow EPA to bring a misbranding action against an unregistered product or a product whose labeling fails to conform with the label approved by EPA, *see id.* §

136j(a)(1)(A) (prohibiting distribution or sale of an unregistered pesticide), § 136(q)(2)(E) (defining "misbranded" as any product that does not bear its approved labeling), EPA contends that the only use for these provisions is to "allow EPA to pursue misbranding action if a pesticide bears either directions for use or warning or caution statements that are not adequate to protect health and the environment, regardless of whether those directions for use and warning or caution statements were once deemed adequate for the product's registration." (Defs.' Mem. at 19.) In making this argument, EPA again ignores the contours of the issue before the Court. Rejecting EPA's interpretation does not render either (F) or (G) superfluous, it merely limits their application to situations where EPA has not already determined that the product itself requires cancellation.

### 4.    7 U.S.C. § 136a(f)(2)  (FIFRA Section 3)

EPA's final textual argument is based on FIFRA's provision that "[i]n no event shall registration of an article be construed as a defense for the commission of any *offense* under this subchapter." 7 U.S.C. § 136a(f)(2) (emphasis added). Rather, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter." 7 US.C. § 136a(f)(2). Based on this language, EPA argues that

> this provision expressly authorizes EPA to use enforcement actions to ensure compliance with the registration requirements of FIFRA where EPA has sufficient evidence to rebut the presumption of compliance that the registration provides. Thus, FIFRA authorizes EPA to bring misbranding action against a registered pesticide at any time, including at the conclusion of the reregistration process if EPA determines that there is evidence sufficient to demonstrate that the product's labeling or packaging do not meet the FIFRA Section 3(c)(5) standard.

(Defs.' Mem. at 20.) EPA's conclusion goes far beyond what the text requires. A FIFRA

registration is essentially a license to sell and distribute pesticide products in accordance with the terms of the registration and the statute. Thus, the Court agrees with plaintiff that "Section 3(f)(2) stands for the unremarkable proposition that a registration is not a defense against an allegation that a product violates the terms of that registration, just as a valid driver's license is not a defense against a speeding ticket." (Pl.'s Mem. at 17.)

### B. Legislative History

Both plaintiff and defendant claim that the FIFRA's legislative history supports their interpretation. When FIFRA was first enacted in 1947,[15] it prohibited interstate commerce in pesticides unless they were registered with the Secretary of Agriculture, properly labeled, and not adulterated or misbranded. FIFRA §§ 3(a), 4(a), ch. 125, 61 Stat. 163, 166-68 (1947). If the Secretary of Agriculture believed that a pesticide did not satisfy FIFRA's requirements, the applicant could insist that the pesticide be registered "under protest" and proceed to sell its product. The pesticide then could be removed from the market only through an enforcement action where the government bore the burden of proving that it was misbranded or otherwise did not comply with FIFRA. FIFRA was substantially amended in 1964, 1972, and 1988 to create the system of registration and cancellation that exists today and the reregistration process that led to the RMD. EPA views the legislative history as evidence that Congress intended to continually expand, rather than diminish, EPA's regulatory authority through amendments to FIFRA. Plaintiff believes the history confirms that Congress intended EPA to use the Section 6 cancellation process to remove registered products from the market for failing to meet the FIFRA's registration standard. The Court agrees with plaintiff.

---

[15]FIFRA replaced the Insecticide Act of 1910.

## 1.    1964 Amendments

In 1964, Congress amended FIFRA to "eliminate registration under protest." Pub. L. 88-305,78 Stat. 190, and replace it with "various appeal procedures where registration is refused or canceled." S. Rep. 88-573, at 1 (1963) (Br. of Amicus Curiae, Attachment 2, Sept. 30, 2010) ("purpose" of the amendments was both "to end the practice of protest registration whereby the manufacturer of a pesticide can market a product despite Department of Agriculture doubts as to its effectiveness or safety," and replace it with "a complete appeal system whereby the applicant for registration can appeal the decision" to refuse or cancel a registration); H.R. Rep. No. 88-1125, at 1 (1964), *reprinted in* 1964 U.S.C.C.A.N. 2166 (same).

The legislative history establishes that the amendments were aimed at several distinct problems caused by the existing system. First, Congress believed there was a "need for the legislation" because:

> [A]t present, the Secretary can be required to register a product even though he is convinced that it is ineffective and dangerous to human life. He can proceed against it in such case only after it has moved to interstate commerce, and he then has the burden of proving that it violates the law. The bill would correct this situation and afford greater protection to the public by repealing the authority for registration under protest.

*Id*. at 2, *reprinted in* 1964 U.S.C.C.A.N. at 2167. A second "need for the legislation" existed because under the protest registration system, if a product had been registered under protest, the registrant was "protected from the effects of failure to register, but not from penalties and seizure if the product is actually misbranded or otherwise out of compliance with the act." *Id.* As explained by Senator Ellender:

> [R]egistration under protest provides a means by which an applicant for registration may appeal from a decision of the Secretary with which he disagrees. However, in order to take this appeal, he must take actions which subject him to

> penalties, the product to seizure, and the public to possible danger if the
> Secretary's determination should prove to be correct.

109 Cong. Rec. 20,079 (Oct. 22, 1963) (statement of Sen. Ellender) (prior to 1964, "if a

registrant disagreed with the Agency's determination as to the safety of its product, its only

recourse was to market the product and face the risk of a prosecution and penalties in an

enforcement action").  By providing that "applicants dissatisfied with the Secretary's action in

refusing or canceling registration may have recourse to advisory committee proceedings, public

hearings, and eventually judicial review," the amendments were designed to both "afford[]

adequate protection to the public," and *"protect[] applicants for registration from arbitrary or*

*ill-advised action by the Department*."  H.R. Rep. No. 88-1125, at 2, *reprinted in* 1964

U.S.C.C.A.N. at 2167 (emphasis added); *see also* S. Rep. 88-573, at 2; 109 Cong. Rec. 20079

(statement of Sen. Ellender) ("[i]n lieu of the existing "unsatisfactory type of appeal," "[t]he bill

. . . provides better procedures to protect the applicant or registrant from any arbitrary

determination").)

The only plausible reading of the legislative history relating to the 1964 amendments is

that Congress intended to eliminate the system of protest registration and to create an

administrative cancellation process to take its place, *see Environmental Defense Fund v.*

*Ruckelshaus*, 439 F.2d 589, 593 (D.C. Cir. 1971) (1964 amendments "eliminate[d] the system of

protest registration and substitute[d] the present administrative mechanism for cancelling

registrations"), because it was concerned both with the risks of having unsafe products on the

market and it wanted to eliminate the system whereby registrants had to risk prosecution if they

disagreed with the agency's determination as to registration eligibility.  To accept EPA's

interpretation in the present case would recreate precisely the same problem Congress intended

to eliminate in 1964: forcing plaintiff to accede to EPA's demand that it change its products to conform to reregistration standards of the RMD or face the severe sanctions of enforcement proceedings. The Court agrees with plaintiff that "If . . . Congress meant to allow EPA to continue to use its enforcement authority to remove already registered products from the market, there was little point to creating the registration and cancellation provisions at all." (Pl.'s Opp'n to Defs.' Mot. for Summ. J. & Reply in Support of Pl's Mot. for Summ. J. at 20, Oct. 29, 2010 ["Pl's Opp'n & Reply"].) Indeed, as plaintiff points out, "under EPA's view of its misbranding authority, an applicant is entitled to a Section 6 hearing if it is denied an initial registration under Section 3, but EPA is free to bypass Section 6 and proceed directly to enforcement if the Agency changes its mind about a registered product and concludes that it no longer meets FIFRA's registration criteria." (Pl.'s Opp'n & Reply at 20.) To afford greater procedural protections to an applicant whose registration is denied than to a registrant selling a registered product in compliance with the terms of its registration is both illogical, *see supra* p.13, and in direct conflict with Congress's clear goal of eliminating the system of protest registration and replacing it with a process for cancellation.

### 2.      1972 Amendments

In 1972, the Federal Environmental Pesticide Control Act of 1972 rewrote FIFRA, both to amend it and to reflect the transfer of implementation authority from the Department of Agriculture to EPA. Pub. L. 92-516, 86 Stat. 973.[16] EPA directs the Court's attention to two

---

[16]As revised, FIFRA for the first time provided "for direct controls over pesticide use, for classification of selected pesticides into a restricted use category, for registration of manufacturing plants, and for a national monitoring program for pesticide residues. In addition, it added environmental effects to the risks to be weighted in the pesticide registration process." H.R. Rep. No. 100-939, at 2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3474, 3476. "The 1972

specific changes made by the 1972 amendments.  Prior to 1972, the precursor to Sections

2(q)(1)(F) and 2(q)(1)(G) in the current statute defined a product as misbranded if its "label" did

not contain "directions for use adequate for the protection of the public" or "a warning or

caution statement adequate to prevent injury to living man and other vertebrate animals,

vegetation, and useful invertebrate animals." *See* 7 U.S.C. §135(z)(2)(c), (d) (1970).  In 1972,

that language was altered to provide that a pesticide is misbranded if "the label accompanying it

does not contain directions for use which . . .are adequate to protect health and the environment,"

7 U.S.C. § 136(q)(1)(F), or "the label does not contain a warning or caution statement which . . .

is adequate to protect health and the environment . . . ." 7 U.S.C. § 136(q)(1)(G).  Section 2(x)

defines "adequate to protect health and the environment " as "protection against any

unreasonable adverse effects on the environment," *id* § 136(x), the same language that appears in

the registration and cancellation sections of FIFRA.  7 U.S.C. § 136a(c)(5); 7 U.S.C. § 136d(b).

EPA argues that these changes show that Congress intended to "significantly expand[]

the definition of misbranding" and make "misbranding and cancellation . . . parallel, albeit

independent, regulatory tools."  (Defs.' Mem. at 24-25.)  Thus, EPA argues, "Congress provided

EPA parallel misbranding regulatory authority to ensure that EPA would apply the same

standard whether it chose to proceed through misbranding action or cancellation – that pesticide

products do not present unreasonable adverse effects."  (*Id.* at 25.)  But EPA's interpretation

ignores the fact that even though the "unreasonable adverse effects on the environment" standard

---

FIFRA amendments made pesticide registrations renewable on a five-year basis, and required
review of all then-registered products to reassess and to ensure their safe use.  This general
reregistration requirement was originally ordered to be completed by 1975, but after a brief
extension, the deadline was dropped in 1978."  *Id*. at 4, *reprinted in* 1988 U.S.C.C.A.N. at 3477.

is now part of the definition of misbranding under subsections (F) and (G), both those subsections are concerned only with a product's "label."  In contrast, in both the registration and cancellation context, the standard is used more broadly to address the use of the product, not merely its label.  *See* 7 U.S.C. § 136a(c)(5) (product is eligible for registration if "it will perform its intended function without unreasonable adverse effects on the environment" and  "when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment");  7 U.S.C. § 136d(b) (product is subject to cancellation if "when used in accordance with widespread and commonly recognized practice, [it] generally causes unreasonable adverse effects on the environment").  Thus, the Court does not agree with EPA that the textual changes to §§ 136(q)(1)(F) and (G) compel the conclusion that misbranding and cancellation are "parallel, albeit independent, regulatory tools."  (Defs.' Mem. at 25).

There is nothing else in the legislative history of the 1972 amendments to support EPA's interpretation.  Indeed, an earlier version of the bill included a provision that a pesticide would be misbranded if "when *used* in accordance with the requirements of the Act or commonly recognized practice it causes unreasonable adverse effects on the environment," language almost identical to the standard for cancellation, but that language was eliminated in conference because

> [t]he conferees do not believe that a manufacturer should be subjected to criminal penalties for a "misbranding" which is beyond his control.  The conference substitute shifts this language to section 3 [registration] and section 6 [cancellation].  Thus, although no criminal penalties are applicable, the Administrator will have the authority to deny registration or cancel where there is a widespread and commonly recognized practice of using a pesticide which generally causes unreasonable adverse effects on the environment.

H.R. Conf. Rep. 92-1540, at 2, *reprinted in* 1972 U.S.C.C.A.N. 4130, 4131.

### 3.     1988 Amendments

The 1988 amendments created the reregistration process that ultimately led to the RMD. In terms of their relevance to the issue of statutory interpretation before the Court, EPA makes three points.  First, EPA argues that it is significant that the 1988 amendments did not take away any preexisting enforcement power because

> Congress presumably was aware of the Agency's assertion of authority to bring misbranding actions against registered pesticides, and the 1986 *Ciba-Geigy* decision, 801 F.2d 430 (D.C. Cir. 1986), which reviewed whether such an interpretation was ripe for review, when it added the reregistration process.  Thus, it contends, it is significant that  Congress could have, but did not, exclude the misbranding tool from among EPA's choices of regulatory actions at that time, just like Congress could have, but did not, make misbranding action contingent on cancellation elsewhere in the statute.

(Defs.' Mem. at 25.)  This argument is problematic, however, because *Ciba-Geigy* was the first time (and only time prior to the pending matter) EPA had ever asserted that it had the authority to effectively cancel a registration through use of a misbranding action, and, significantly, the case settled prior to any decision on the merits of EPA's position.   Nor is there any indication in the legislative history that Congress was even aware of *Ciba-Geigy*, much less that it was approving EPA's novel position in that litigation.

More generally, EPA argues that the 1988 amendments, along with the 1964 and 1972 amendments, "establish that Congress steadily expanded EPA's regulatory authority."  (Defs.' Mem. at 24.)  Even if that is true, that general proposition does not suffice to answer a specific question of statutory construction, especially where, as here, the text, structure, purpose and legislative history point to a different conclusion.

## CONCLUSION

Having considered the text, structure, purpose and legislative history of FIFRA, the Court

concludes that Congress clearly did not intend to give EPA the authority it asserted in the RMD to bring a misbranding action in lieu of a cancellation proceeding against a product that failed to comply with the RMD and, therefore, in EPA's view, no longer meets the Section 3(c)(5) criteria – the standard for registration, reregistration and cancellation.  As the statute is not ambiguous, it is unnecessary to decide what level of deference EPA's interpretation would be entitled to under the second step of *Chevron*.  *See*, *e.g.*, *Martini v. Federal Nat. Mortg. Ass'n*, 178 F.3d 1336 (D.C. Cir. 1999).  Accordingly, the Court grants plaintiff's motion for summary judgment and denies defendants' cross-motion.  A separate Order accompanies this Memorandum Opinion.


                                     /s/
                             ELLEN SEGAL HUVELLE
                             United States District Judge


Date:   January 28, 2011